May it please the Court, this case should be decided based upon the established law of this circuit as articulated by this Court in San Jose Christian College v. City of Morgan Hill and in Christian Gospel Church v. City and County of San Francisco. In Morgan Hill, you articulated a clear rule for what constitutes a substantial burden under the Religious Land Use and Institutionalized Persons Act. You said that the burden imposed by a local government regulation must be oppressive to a significantly great extent, that it must impose a significantly great restriction or onus upon religious exercise, and that the city's regulations and zoning denial  burden on religious exercise because it did not, they did not render exercise in the jurisdiction generally effectively impracticable. Counsel, let me direct your attention to the standard of review in this case. All right. This is an appeal from an injunction entered by the district court. As to matters that the Court found as to matters of fact, what is our standard of review? Your Honor, this is an appeal from a grant of summary judgment. And so your review is de novo review of the facts that appear in the record. If there are any triable issues of fact contrary to the finding of the district court judge, we should reverse. That's correct, Your Honor. Fine. Second question is this. Take me through a little bit of the history of this case. All right. The Sikh group first sought to erect their temple in a residential neighborhood. True? That's correct, Your Honor. There was some neighborhood activists who came out and said that, or neighbors, who said that they made too much noise, it was too much traffic. And the planning commission found against the Sikhs. That's correct, in an appealable determination. That's correct. At that hearing, and before they bought the second piece of property, which was agricultural, was there any guidance provided by the planning commission or the county of Sutter as to what areas other than the residential plot as to which they had contracted for purchase? The Sikhs should look for space. If I could take a half a step backwards. The reality here is that this case was tried. The parties agreed to try this case on an administrative record. The references to what happened with respect to the Grove Road facility, the facility in the residential district, are references that only appear in the administrative record as they relate to the application on Washington Boulevard. So there isn't, to answer your question, there isn't a complete record concerning if the Sikh Society was directed to other specific parcels of property. I can tell you this. The Sikh Society was advised that there were concerns with respect to noise, with respect to traffic, and with respect to light at that residential facility. They apparently agreed with that determination,  which would have been a de novo repeal, I'm sorry, appeal, and it was their right to do. They also state in their complaint, in this action, that that site was eventually too small to accommodate the growing size of their congregation. And so moving to the agricultural facility, the agricultural site, or a larger site, I should say, was to serve their own needs. All right. So then they went out and found some other land. They did. All right. And the Planning Commission agreed with them in a four to three vote and said. Four to three, yes. Four to three vote, even though there was some opposition in the Planning Commission. That's correct. Now, the Board of Supervisors voted unanimously against them. Yes. On the theory that they were leapfrogging from residential to agricultural land. Yes, there's a great deal of agricultural land in Sutter County. This piece of agricultural land is fairly far from the existing core of the county for other types of development. At the hearing before the Board of Supervisors, was there any direction to the SEEK group as to what land was available and would be approved? There were references in the record by people commenting that there were other sites further down on Washington Boulevard, closer to the more urbanized development in Sutter County, where a number of churches, synagogues, and temples were already located, that that would be a more appropriate location. There was also a specific volunteering by one member of the Board of Supervisors to help the SEEK society find a location where it could locate within Sutter County. I want to emphasize a point to the Court, because I don't want this to get lost. This is a substantial burden case. This is not a discrimination case. It is not an equal protection case. It's not an exclusion case. And it's not an unreasonable limitation case. All theories that can be advanced under RLUIPA. But in point of fact, the exclusion and unreasonable limitation causes of action under RLUIPA were specifically adjudicated on summary judgment in favor of the county. This is only about the burden that the denial imposes on the SEEK society. How many places do they have to have turned down before the burden becomes substantial? The test under City of Morgan Hill is when it renders religious exercise in the jurisdiction effectively impracticable. And in maybe the case of Urban Believers v. City of Chicago, that's the case that in Morgan Hill, this Court found entirely consistent with its holding. And in that case, there were multiple use permit denials and efforts extending over a decade to cite churches in the City of Chicago. Now, we're not saying that that's going to happen in this case. What we're saying is that there were legitimate land use reasons for determining that the SEEK society should not locate or be granted a use permit to locate on that agricultural parcel. And those legitimate land use reasons were, one, leapfrogging, right? Leapfrogging. What else? The policies established in the general plan with respect to conflicts between land uses and leapfrog development, and the county's overall policy for preserving agriculture. It's an agricultural county. So, yes. Now, I did mention before that Christian Gospel Church is also a relevant precedent here. I think the rule in Morgan Hill is clear enough to resolve this case. But Christian Gospel Church is an important decision because it was decided under free exercise clause jurisprudence. And so to the extent that RLUIPA purports to fully codify free exercise clause jurisprudence, Christian Gospel Church represents something of the outer limit for how broadly the substantial burden provision under RLUIPA can or should be interpreted. And in Christian Gospel Church, you had a situation where a religious organization applied for a conditional use permit in a residential neighborhood in the city of San Francisco for homeworship. And that was that application was denied, largely based upon community opposition and inconsistency of that use with the surrounding uses. And this Court found that the burden imposed in that case was minimal, that it was a burden of mere convenience and expense. What about their arguments, though, that where they are now, they're being – they painted the – parking is impracticable because they painted the curbs red along near the church, that they have – the city itself has parades and all sorts of things that make it difficult. They will not – if they're forced to go farther out, they can't reach the aged, the handicapped, the poor, which is the mission of their church. Nelson, I'm not sure any of that evidence is in the record on this case. I think you're talking about the Elsinore Christian Center case. I'm – I'm – perhaps I have confused the two cases. But the point is wonderful, because the reality here is that there are a number of ways that the case laws tell us that substantial burden can be demonstrated. The availability – unavailability of alternative sites is obviously the touchstone. It's something that was mentioned in Morgan Hill. It's something that was mentioned in Civil Liberties for Urban Believers. Frankly, even in the cases that we would consider bad for us, like Cottonwood Christian Center, the district court case, it was mentioned there that there weren't available alternative sites. There's no evidence in this record of an unavailability of alternative sites. There – there's no evidence that there's an undue amount of time and expense that would be consumed in locating alternative sites. There's no evidence that there is an inability to currently worship elsewhere. In fact, the evidence before the Court is that Guru Nanak Sikh Society has been operating in Sutter County continuously since 1991. There is no evidence of site-specific religious beliefs, which this Court suggested might be a relevant consideration in Christian gospel church. There is no evidence that the county will prohibit future applications. In fact, on a summary judgment standard, the evidence before you tells you that you have a member of the board of supervisors offering to help find a suitable site. Recognizing that the goal here is to find a place where the Sikh society can worship. There's also no evidence that we are interfering with an existing ongoing operation, which this Court found it to be a relevant consideration in Christian gospel church as well, where what is happening is there's an effort to change religious practice. The burden is deemed to be less significant. Those are all pieces of evidence that could have been inserted in the administrative record, and had they been inserted in the administrative record and presented to the county board of supervisors, it would have had a fair opportunity to evaluate these types of potential burdens. May I take you back to a couple of points that you made? You said the legitimate land use reasons for denying the permit, I got my notes for two. One, leapfrogging. Where in the land general plan or other land use regulations which were printed is leapfrogging indicated? You mean a policy against leapfrog development? Yes. Let me get to it. The general plan defines AG-20 land as land for the production of food fiber. It directs the county to avoid leapfrog development by prohibiting the redesignation of adjacent agricultural parcels until urbanization becomes predominant in the immediate area. A key general plan goal is to minimize conflicts between agricultural and non-agricultural uses. That's in the excerpts of record at tab 5, page 543, and at page 547, and it is cited at page 11 of the appellant's opening brief. The second question, as I understood the record, there's about a 23- or 2400-foot square foot house on this plot of land. That's right. And the Sikhs want to enlarge it by 300 square feet. I believe to 2800 square feet. I might be wrong by that. All right. So is there any indication that the agricultural use surrounding the house, the orchard, will be stopped? It's not so much that it will be stopped. There are fumigation type of operations that would be inconsistent with the neighboring land use. And frankly... Not the Sikhs fumigating. No, no, no, no, the adjacent orchards. So other people would be fumigating and the Sikhs would have to be advised of it so they wouldn't... Yes. The neighboring agricultural operations would have to accommodate... I mean, when you say that one of the purposes, one of the legitimate land use purposes is to preserve agricultural land, my question to you is, is there any indication that the temple? No. There is no indication of that. However, what we're talking about is the consistency of the temple use with the adjacent agricultural land and the policy to avoid expanding... That's an abstraction. I'm talking about facts. It's easy to create an abstraction and then salute it. The question is this. You say one of the legitimate land use objections is to preserve agricultural land. Tell me what in the Sikhs' application will indicate that they will not keep farming the orchard. There's nothing in the Sikhs' application that says that. There is evidence in the record that there is another Sikh temple not far away and that there has been community opposition based upon trash and activity and whatnot that has gone on at that temple site. That's the Bog Road temple site. And so there is... Is that a legitimate land use objection to the use of this site? Well, it's certainly indicative... Was it brought up at the county sub-board of supervisors? I'm sorry, I didn't hear you. Was it brought up at the county board of supervisors? It was. It was. It's in the record. I didn't think so. Yes. The reality, though, Your Honor, is that the county board of supervisors makes a policy-based determination, and that policy-based determination is memorialized in the general plan, and if the general plan says avoid leapfrog development, well, then the board of supervisors, because the general plan is the constitution for all development within the county, has to follow the general plan. And it's that finding of consistency with the general plan that lays at the heart of any subordinate land use determination. Counsel, were the Sikhs requested to sign a waiver of any damages for fumigation to individuals who might be in the stream of the fumes? They were requested to make accommodations to deal with fumigation issues. And from a staff perspective, those accommodations were deemed sufficient. Again, the problem here, I want to focus on two things. First, the problem here is a question of finding consistency with the general plan and implementing the general plan. It isn't about the specific concerns with this property, because the general plan dissuades leapfrog development. That's A. B. But the specific, you have to look at the specific requested use in order to make a determination as to whether or not the general conditions of the zoning plan are satisfied. So you can't divorce those. Well, the reality is that no amount of conditions on that particular piece of property avoids the leapfrog development policy in the general plan. I guess that's the point I'm trying to make. The broader point that I'm trying to make is the reasons for the Board of Supervisors' denial. Well, we believe they were legitimate exercise of land use authority, are somewhat astray from the question what the burden of that denial was on the ability to practice religious exercise of the Sikh society. This is not an unreasonable limitation case. That action was summarily adjudicated in favor of the county. It's not an equal terms case. It's not a discrimination. It's not an exclusion case. It's a substantial burden case where we look at the effect of the restriction on religious exercise. And as I've stated, there is no evidence of the burden on religious exercise under this Court's precedent in Morgan Hill or in Christian Gospel Church. Now, I want to turn, because despite all the time you've given me, I'm going to turn to the other one. I imagine the Sikhs would say that the first place they go, the neighbors say there's too much noise and too much traffic. Then they find some place where there won't be any neighbors to complain about too much noise and too much traffic. And then they say, oh, no, now the problem is leapfrogging. And you can imagine why someone might get the impression that every place that they go, there'll be some objection to some pretext. Frankly, Your Honor, that impression would be wrong. The reality is that in the record, we have statements that the pride of Sutter County is the pride of churches, temples and synagogues that it has. We also have evidence in the record that you can't locate anywhere in Sutter County a religious use without a use permit. You take those two factors and put them together, the notion that it would be futile to keep trying, which is essentially what you're asking me, is betrayed by the evidence in the record. What happened here was that there was one use that was proposed that the Sikh Society ultimately agreed wouldn't accommodate its long-term land use needs and abandon an application. And then the second time, just like Christian Gospel Church, you had a circumstance where the Board of Supervisors exercised its legitimate land use authority to say this isn't consistent with our general plan and our zoning code. And I'd like to move to individualized exemptions and that portion of our analysis just briefly. I think it's going to get a lot of discussion in the Elsinore case as well. So very briefly. The reality is in this case, the district court, the appellee, the intervener and the two amici supporting the appellee all say that the individualized assessments jurisdictional trigger under RLUIPA is just a codification of the individualized exemptions test that was originally established in Smith and then expanded upon in City of Hialeah. We think that you ought to take all of those parties at their word as far as that goes and apply individualized exemptions tests. You know, the proof is in the pudding. Let's take the individualized exemptions test and apply it to this case and see if what you have is an individualized exemption. The first point to make is, under the City of Morgan Hill's test in the free exercise portion of the decision, the use permit process is a neutral law of general applicability. In Morgan Hill, you said a law is one of neutrality and general applicability if it does not aim to infringe upon or restrict religious practices because of their motivation. Well, that's certainly true in this case. You have a use permit process that is applicable to all uses, secular and religious alike, regardless of and doesn't look at religious motivation. It looks at land use consistency issues. Then you went on to say that it is neutral and generally applicable if it does not in a selective manner impose burdens only on conduct motivated by religious belief. Again, the use permit process doesn't in a selective manner even consider religious belief. This is a neutral law of general applicability. And lest there be any confusion, we can take a specific look at the individualized exemptions test under Smith. In Smith, the rule established, and I hate to read it, but just to reiterate, in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without a compelling reason. Here, again, there isn't any refusal to extend a system to cases of religious hardship. In fact, there's no refusal to extend a system at all. The use permit process is extended to all non-permitted uses, which are just agriculture and agriculture-supporting uses. And it happens irregardless, I'm sorry, regardless of the religious nature of the use on site. And there isn't a refusal to extend it to cases of religious hardship. As the record indicates, you have a circumstance where the number of churches, temples, and synagogues in the county are the pride of the county. So this is not a system of individualized exemptions under the Smith-Hialeah line of cases. And so if you take the appellees, the district court, the intervener, and their amici all at their word, the reality here is that you do not have you have not triggered the individualized assessment portion of RLUIPA such that it even applies. Now, if you want to interpret the individualized assessment provision of RLUIPA in some other manner, you run into constitutional problems. Constitutional problems, I think, are going to be almost the exclusive focus of the next discussion. So I'm going to just do my best to set the stage. The way I look at it, it's as easy as A plus B equals C with the free exercise jurisprudence. An individualized exemption plus a substantial burden on religious exercise equals compelling governmental interest test, a test that is what two Supreme Court justices have said, strict in theory but fatal in fact, the single most searching test known to constitutional law. What RLUIPA does under the district court's and the appellee's interpretation is switch A, individualized exemptions for individualized assessments, a term that under the appellee's reading would apply to virtually every land use decision involving a religious exercise, switch B, substantial burden on religious exercise, by changing the term religious exercise to include any use, building, or conversion of real property, which under the appellee's authorities would essentially mean that any time a use permit is denied on the merits, it is per se a substantial burden on religious exercise, and add a least restrictive means to the compelling government interest test, the prong to that test as it was elaborated on in Smith – I'm sorry, in the pre-Smith jurisprudence. And so what you would have is all three pieces of that equation completely swapped out, a brand-new test, and if there's any confusion about it being a different test, I advise you to just take the words of the district court in his summary judgment ruling. At page 45, at the end of his decision, he says, Under the prevailing constitutional jurisprudence, the free exercise clause is less protective of religious freedom than RLUIPA. So you will hear a lot of dialogue today. So you agree with that part of the district court ruling? I agree with it as far as it goes, except for I don't agree with the district court's interpretation of RLUIPA. Again, I come back to fundamental principles. I just urge you to apply Morgan Hill, and if you think that in any way the Morgan Hill rule doesn't fit the facts of this case, I urge you to look at Christian Gospel Church as the constitutional backstop for the – for the breadth of your ability to interpret RLUIPA. Are you suggesting that we should wait until the Supreme Court states that zoning decisions qualify for the exception to Smith? I actually think that if you look at City of Borne, you'll see that the Supreme Court has already said that zoning decisions are neutral to laws of general applicability. All right. Yeah. One, I have to – Counsel, if you want rebuttal, I would suggest that you save your time. I'll sit down. Thank you. Good morning. If it pleases the Court, my name is Michael Barrett. I'm the attorney for the Guru Nanak Sikh Society of Yuba City. Is Mr. Tring going to argue? Yes. I have agreed with regard to my 25 minutes to split that and allow the United States 10 of those 25 minutes for that period of time. Thank you. The thing that I want to talk about that I think is most important to this case is that I think the County of Sutter doesn't have the correct focus with regard to what is a substantial burden. I think what the County of Sutter is ignoring is that what is a substantial burden is incapable of definition from a legal standpoint, but it is rather a fact-driven analysis looking at the facts of each and every individual case. Counsel, I would agree with you that I think that's the crux of trying to decide these cases, and I admit in Morgan Hill I struggled with that because the Congress indicated that substantial burden is to be defined by Supreme Court jurisprudence, but nothing in Supreme Court jurisprudence defines substantial, and that's the difficulty. So hopefully you'll enlighten us so that we can clarify and set out some rules that everyone can be sure of. I think I can, at least the best that I think I can. It's like Supreme Court jurisprudence with regard to what constitutes a taking. It has never given us a bright-line rule. It has only given us signposts along the way, and those signposts sometimes seem to change. Are you arguing that we should look at each case individually, and then substantial burden, we know it when we see it and we don't have to define it? That sounds like obscenity. Exactly. No. What I'm saying to you is that substantial burden does have meaning, but it has both a qualitative and a quantitative analysis, and I think in looking at all of the opinions that I cited, I think the judge that came the closest to defining it was Judge Ferguson, the district court judge in the Castle Hills case, and he analyzed it in this fashion. What I think it doesn't mean, I think, is very important. What counsel would like it to mean, seizing upon the club language, which of course in Saints Constantine, the Seventh Circuit, completely undid their club language in any event. So to seize upon that now, in light of the Saint Constantine decision, which I cited to you in my letter brief, updating the law in this area, what counsel seems to state is that the standard is, if there's some outside possibility that you can exercise your constitutional rights somewhere else or in some other fashion, that you have to exhaust all reasonable or  Let's go back to Sherbert. In Sherbert, all the Supreme Court required was that the Seventh Day Adventist show that she had applied approximately, as I recall the record in that case, three times for jobs in which she wouldn't have to work on a Saturday, and she wasn't successful. Now if we took counsel's analysis, the Supreme Court would have said, you've got to show us that you've applied for every possible job in the area before we'll allow you to That is not and cannot be the standard. As the court explained in the Saints Constantine decision, when it looked back on its club analysis, is it belied counsel's own argument. It said here the district court misread our decision in club, but it pointed out that in essence what was going on was that in club they were only looking at the statute in terms of how it was designed. And it says it didn't seem to the panel majority in club not to place a substantial burden to have to apply for what amounts to a zoning variance to be allowed to build in a residential area. That's what this court said in San Jose Christian College. It doesn't seem to us to be a burden for you to finish the application. Because and you said in your opinion, it's not all that clear to me that if you didn't finish the application, it probably would be granted. We did that with regard to our case. You said it would probably be granted. You said it would. It's not clear that it would be allowed. Not clear that it wouldn't be. Okay. Didn't mean to misquote you. But in that opinion, what you were basically saying is it's not a substantial burden to require you to comply with those governmental regulations which everyone needs to comply with to simply get to the process where we can make a decision. That's not unreasonable at all. We have done that. The second distinguishing feature, counsel cites the Christian Gospel Church case, and that case doesn't assist counsel any further. That was an opinion by Justice Nelson. And in that case – Judge Nelson. I'm sorry? As we say, there ain't no justice in the Ninth Circuit. By Judge Nelson, I apologize. In that case, again, a fact-driven analysis, that simply doesn't apply here. As you found, it's not a significant burden. You're coming to us and you're saying you need this home to worship in because, quote, home religion is important to you, yet you've been doing all of your religious services before now in a hotel. Now, basically what you were saying to those persons is you were saying, to quote the Bible, the hands are the hands of Esau, but the voice is definitely Jacob's. The modern translation of that Bible passage is you're pulling my leg here, okay? This is not a substantial burden. And more importantly, you haven't shown why you can't alleviate your problems either by dealing with the concerns in that area or finding some other reasonable place under these circumstances. What distinguishes our case from that case? We did exactly what you told us to do in this case. We went to the court. Is there evidence that really shows that there is no other place that you can go? Is there evidence that there is no other place we can go within the county of Sutter? Indeed, to carry out the mission of the church. That would be impossible to show, I think, under any standard. But with regard to what counsel said, you know, the area that they're talking about on George Washington Boulevard, we call it Church Row. There literally are a number of churches there. That is not within the county of Sutter's jurisdiction. That is within the city of Yuba City's jurisdiction. It would require us to move to a different jurisdiction and to apply to a different jurisdiction. And I don't believe that constitutional rights can be practiced in an area where a person can't be forced to leave simply because the expediency that they can practice their constitutional rights elsewhere. Is it your representation that there is no similar area in Sutter County where churches are located? Like I said, or I think Judge B. said for me. Bea? Bea, I'm sorry. That he said for me quite clearly. It's sort of like we were told, well, we don't want you in a close area where all of the surrounding problems. So we moved to a nice, tranquil area and then. That wasn't my question. Okay. You talked about the Church Row in Yuba City. I asked you if there were a similar area in Sutter County that had kind of a group of churches or an area that's known for churches to locate. Right where we're at. The other Sikh temple is three parcels away. Okay. Not just Sikh temples. I'm talking about is there any area where there are religious institutions generally in Sutter County? No. No. There really aren't. Did I get you right that there is a Sikh temple three parcels away from. Yes, that's in the administrative record. I cited in my brief all of these circumstances. Is that Sikh temple in Sutter County or in Yuba City? It's in Sutter County. It's only three. It's on the parcel map that I cited to the administrative record. And one of the arguments was that. Is it. Pardon me. Pardon me for interrupting you. Is it contiguous. I'm taking his time and I apologize. Is it contiguous or is it separated so that we can say that it is not leapfrogging or it is leapfrogging? No, it is. It is definitely as far out as we are, in fact, a little further. So you would say it is leapfrogging. Oh, definitely. Now, is there any difference between that other Sikh community or religion and your Sikh community or religion? The only difference is like happens in Western religions is you get certain persons that don't agree with certain factions. And so they decide to form their own church. And in fact, I think our folks were part of that faction. It's sort of like the Methodists and the Episcopalians. That sounds like a reasonable. Yes. Thank you. What's the citation to the Castle Hill case with Judge Ferguson that you referenced? What's that citation? At the time I did the brief, I apologize. I only had the U.S. District Lexis citation at 2004 Lexis 4669. I've not updated my research for the actual site of that now. Concede to the government. Yes. I will concede to the government with my apologies. Thank you. And may it please the Court, I'm Eric Treen, Counsel for Intervening in the United States. I'm here to address the constitutionality of our LUPA, which was challenged by the county here. The purpose of our LUPA, as the sponsors, Senators Hatch and Kennedy, stated in their statement for the record, was to make for visibility and easier enforcement of the free exercise provisions as they apply to zoning laws. And it is not unremarkable that they did this because there are a handful of Supreme Court cases on free exercise. They range in subject matter from a chicken-sacrificing case to peyote cases. And it sometimes is confusing to zoning boards, houses of worship and the counsel who advise them. What's the appeal? But, Your Honor, I would say that the Seventh Circuit said quite succinctly this was an uncontroversial use of Section 5. Likumi, in fact, had three ordinances before it. One of them was a zoning law, a zoning law regulating where you could have slaughterhouses. So it is not enough to say that you have to admit that that was a pretty specific ordinance in that case. It applies in a wide range of areas outside the unemployment context. It applies in – I want to take issue with what counsel for the county said regarding this isn't an individualized exception case. The Supreme Court, both in Likumi and in Smith, when they cite the standard, they say the individualized assessment tests and the very next sentence, individualized exceptions, they are one and the same thing. In Smith – What's your response to opposing counsel's citation to the City of Borney case that says zoning schemes are laws of general applicability? In the Borney case, the Supreme Court was looking at a facial challenge to the constitutionality of RFRA. RFRA was a law passed after the Smith decision that sought to overturn Supreme Court precedent wholesale to say that in every government action that burdens religion, that there must be a – you must meet the compelling interest test. The evidence before the Court that it considered before Congress when it enacted RFRA was very generalized, really did not deal with discrimination, but dealt with burdens that people had from generally applicable law. In contrast, in Arlupa, the record was focused on discrimination, on a study showing that minority religions making up no more than 9 percent of the population were responsible for 49 percent of the published zoning cases. That minorities disproportionately faced hurdles in the zoning process. That sometimes discrimination can be proven. In this case, it was not. But more often, Congress found there's subtle discrimination. There are groups that are unfamiliar, that are new to an area. You know, you have the First Presbyterian Church. They're there, but a new group comes along that's unfamiliar. They face the kinds of troubles that we see here in this case. And just as in Sherbert – How does that argument fly with the fact that there's a Sikh temple in that very community? That can cut two ways, Your Honor. Sutter County has the largest Sikh community of any county in the country. I believe that's in the record, 15,000 Sikhs. It can be – we've let in – one is okay, but we don't want a lot of those folks here. So that argument can cut two ways, and I don't think it's dispositive here. I want to emphasize that in the Sherbert test, there was no evidence of animus towards – towards Seventh-day Adventists. Rather, the Supreme Court adopted a rule in Sherbert that would take these cases where there's discretion, where in the case of unemployment, there is a good cause showing. If you can show good cause for not working, then you are entitled to unemployment. And so, by its very nature, unemployment compensation is individualized because it's person by person by person. Certain elements of unemployment are, Your Honor. There's a good cause provision for not working, but there's also in the unemployment context misconduct, as in the Smith case. In the Smith case, where the Court found a generally applicable law, it was an unemployment case, but it dealed with misconduct, with drug use. There, there's no – it's individualized, in a sense, because it's one person coming before the board, but there is not that broad discretion. Whereas in the good cause provision, which was at issue in Sherbert, it opened itself up to a wide range of subjective considerations. And in those situations, minority religions like Seventh-day Adventists were disadvantaged. So, too, in the zoning context. Can I ask you, counsel, to give me your strongest case support for your proposition that zoning incorporates individualized assessments for purposes of ARLUFA? For that, I would turn to two people. Ask for your best case. I would say Lukumi, because one of those three – again, as I mentioned at the outset, there aren't a lot of free exercise cases in the Supreme Court. I would turn to the – What language – what language are you relying upon to say that zoning – Context – I'm asking a specific question about a specific – Sure. The line – I'm asking a specific question about a specific area of law, zoning law. And I'm asking you, what's your best case authority specifically addressed to zoning that says individual assessments are a component of zoning decision-making? Is there one? Because of the possibility in the Supreme Court, I would turn to the Seventh Circuit, which held in the New Berlin case that this case was on all – was in uncontroversial use of Section 5 because the scheme in Sherbert and the discretion there was identical to what was seen in the special exemption system in the zoning scheme at issue in  So what's the case? That's St. Constantine's and Helen Greek Orthodox Church v. New Berlin. Okay. So now you're saying the St. Constantine case says that zoning decisions are individualized assessments for purposes of free exercise or First Amendment jurisprudence. Yes, Your Honor. And what language specifically in that case says that? I do not – I do not have that at the tip of my tongue, Your Honor. But Congress in its hearings surveyed the case law. They had testimony from 78 witnesses in nine hearings over three years. And their – Congress's determination, using its obligation under Section 5 of the law, found that the zoning situations where you have this individualized determination were quintessentially the individualized government assessments that you saw in the Sherbert test. But you don't have to go that far. This isn't really a zoning case. This is a case for the denial of a special permit, special use permit. Yes. I'm not saying that all zoning determinations just because they're individualized. Somebody may come up and say, I have a specific plot and I want to build a specific type of structure there, and the zoning board will look at it and say, well, no, you're exceeding the height limit. That's a generally applicable law. That's what the professional staff does. And, in fact, in this case, the professional staff reviewed the facts and determined that with all the generally applicable requirements that, in fact, they had met them. But that's not binding on the ultimate decision maker. It's the same thing in Morgan Hill. No, it's not. But my point is that when it got to the ultimate decision maker, there they were able to call on very fuzzy principles like consistency with the general plan. They, in fact, found that it was inconsistent with the health, safety, and welfare of the surrounding uses. Now, frankly, I don't understand how they could have found that it was detrimental to the health of surrounding uses. But, in any event, they so held. But when you get to welfare and consistency with the general plan, there you're talking about those areas, just like in Sherbert, with good cause, that they're so subjective that when you're dealing with leapfrogging is not subjective. That's the plan. That's the element of the general plan which the county says is a matter of general application. Anybody knows what leapfrogging is. You've got an agricultural area, and then you've got a residential area, and you're jumping out into the agricultural area, put it into residential use. But here they're leapfrogging into one of the very few areas in which houses of worship that aren't grandfathered in have been shoved. They've been shoved into these six areas, some residential, some agricultural. And for them to turn around and say, well, that's not consistent with the general plan when we've already put you in these six specific areas, that indicates that it's the type of subjectivity that the Supreme Court was concerned about in Sherbert and which Congress is concerned about here that opens itself up to the possibility of discrimination, not discrimination in every case. Don't we have to, if you say there's six areas into which the Sikhs can move, right? Yes. So don't we have to conceive a little bit of what the relevant market is here so that we can understand where the substantial burden is? I mean, if there are five other areas into which they can move, how can it be a substantial burden if they can't move into one? This Court's instruction in San Jose, the standards, imposes significantly great restriction or onus upon such exercise. I think that's a great starting point. Similarly, Christian Gospel Church v. San Francisco, they say convenience and expense are not enough. In that case, there was evidence in the record that there were two properties right around the corner that would have been sufficient. And they picked one property. They didn't get their way. They ran to court. Here you've got a group that has played by the rules, that has done everything they were supposed to. They went to a residential zone. They were approved by the career planning staff and then shot down the political subjective process. Let me ask you this. If you were convinced that the leapfrogging concerns of the commissioners were legitimate, would you think that there was a legitimate Arlupa claim? I would, Your Honor. And I would turn to the Seventh Circuit's concerns expressed in New Berlin, is that when a church experiences delay, uncertainty, and expense, where someone acts in good And I think counsel for the temple was correct in pointing out that she applied to three other jobs and didn't get them. The court noted that, other than her, only one of the 150 other Seventh-day Adventists in the area had trouble finding work. But nonetheless, because My question was this. If the leapfrog concerns were legitimate, there was no question but that these were legitimate concerns by the commissioner and it's consistent with the zoning plan, would there still be a violation of Arlupa in your opinion? But I think your question requires conceding that leapfrogging is itself a legitimate government concern. Do you take issue with that? I can't do that because I'm not sure that that can be a legitimate concern when the leapfrogging is into one of the little areas in which houses of worship have been I just can't. Okay. If we didn't have that scenario, if we just had leapfrogging and this was the first institution that was trying to go into that area. And there were many other zones that hadn't been tried that were possible then maybe, but that's not the case here. But I'm asking you a question to see how far your argument goes. And I'd like it if you would answer that question, please. Can you repeat that? My question was, if you were convinced that the leapfrogging concern of the commissioners was legitimate and this were the first, this was the first institution to leapfrog into one of the six districts, would there be a legitimate Arlupa claim in your opinion? I believe that a petitioner who, because we still, even positing those facts, who had gone through the process working with the planning staff, the career planning staff, the professional staff to meet concerns, and that planning staff in this agricultural zone where their leapfrog is alleged had nonetheless said this is a use that can work here, then I would say no, that is not a legitimate concern would be my answer. Thank you. But I would point out here that Congress doesn't have to get it exactly right. What the, what the, what they need to do as the court said. I didn't get your answer. Did you say that if it were a legitimate leapfrogging and they were the first to leapfrog, so long as the professional staff said, okay, it would be a substantial burden for the county to say no? I would say it could be a substantial burden where you had a pattern where a house of worship, like a Sikh temple, had worked on one occasion with the, going up through the appeal, then said, okay, you don't want us in a residential zone, we'll move to the agricultural zone, worked with the staff, got up through the, just if you have this scenario that you have here, notwithstanding the fact that Judge Rawlinson has posited, I would still say in those facts it would still be a substantial burden for the county to say no.   And I think that's where the faith of the applicant carries the day. It doesn't carry the day. But I think that, coupled with multiple attempts, and to attempt, are multiple in your view? It is in this circumstance where they went through two levels of review in the first one, and three in the second, in both cases, with the blessings of the professional planning staff. Counsel, pretty much any time there's a denial, in your view, if there's a denial of a zoning, a use permit, and it's a religious applicant, you pretty much would shift the burden to the zoning officials to show that they acted in good faith. That's pretty much what you're articulating, isn't it? I would go back to Sherbert as my touchstone. Mrs. Sherbert Say yes or no to that question. Are you pretty much shifting the burden to the zoning officials to show good faith? No, it's still up to the House of Worship to show that they have been burdened. But they can show that. I think Sherbert instructs, by the way, in New Berlin, the New Berlin case in the Seventh Circuit, it was only one case. But the facts in that case were such that good faith was shown, futility of reapplying was also shown. So one was enough. In this case, futility of reapplying was enough. No. In that case, you only had one. Here you have a situation more similar to the Sherbert case, where there were several good faith attempts. The person is stymied in their effort, and then the court says that's a substantial burden. But they don't win with that. In this case, didn't the Sikhs abandon the first site? And how can you hold that against the zoning officials if that site were abandoned, if that effort was abandoned? They chose, I think another fair reading of that is they were being told that they weren't permitted in this county, which is agricultural. And they decided to go along and try their best there. But I would turn back to the issue for which I am here primarily, which is ---- You put yourself in a different position. You argued something you weren't really here to argue. Well, they are so tied to one another that Congress looked at the law, looked at the zoning context, and using its obligation under the Fourteenth Amendment to enact laws to protect equal protection and due process of law, took the Supreme Court at its word and enacted legislation that followed the Supreme Court's standards. And therefore, it's a fully constitutional and, as the Seventh Circuit said, an unremarkable use of ---- an uncontroversial use of Section 5. The reason I stray into the substance of substantial burden is because we believe that Congress did not exceed in any way the standard that's already out there. Even if it did, we believe that the record that Congress established of discrimination, especially against minority religions, that this remedy, if it goes even ---- if it goes a little bit beyond the ---- what the Supreme Court has provided as protection, that it's a congruent and proportional response. So basically your argument is you want us to follow the Mayweather's decision and say that our LUCA in this context is constitutional. Yes. Of course, Mayweather's did not address Section 5. I understand. I understand. I understand. Thank you very much. Okay. Thank you, Your Honor. Judge Rawlinson, I'd like to pick up on the question that you asked about essentially shifting the burden to local government agencies to ---- Could you speak up? I can't hear you. I'm sorry. I want to shift to the question that you asked about shifting the burden to local agencies to demonstrate good faith. I think you haven't, regardless of Judge Nelson's comments, you haven't done justice to Raluca's test there. It's shifting the burden to local agencies to demonstrate a compelling governmental interest by the least restrictive means possible. That is essentially the position that's advocated by the United States and by the appellee in this case, because when you get right down to it, their position is a denial on the merits of a use permit application constitutes a substantial burden on religious exercise. Well, counsel fudged a little on that. He said under the circumstance ---- that's why I was trying to ask him the question. But he said under the circumstance of this case, he wouldn't say absolutely in every case where there's a denial there's a substantial burden. Well, you have to consider the circumstances of this case. You have one abandoned application and one application that was brought to conclusion and there was a substantive decision based upon general plan policies. So it doesn't get more basic than that. You're not talking about evaluating religious exercise. And what you of utmost importance don't have is proof of the burden, of the availability of alternative sites, of all of those other issues that I discussed in my first argument. So one thing was curious that opposing counsel pointed out, that there's a Sikh temple that's already in this area. How do you ---- how can you explain the granting of the application for one Sikh temple that had leapfrogged previously, apparently, and the denial of a second one? Frankly, I don't have the background on whether that Sikh temple predated the zoning code or the general plan. That's one possible explanation. But I can tell you what the record says about that temple. Here's a statement from citizens, actually from the family that donated the property so that that temple could be established. We already ---- this is a quote from the record at page 110 to 111. We already have one temple on Bogue Road, this is the other Sikh temple, which curtails our spraying schedules for our orchard on the west side of the temple. We own the property on the west side of the temple and have to deal with trash left in our orchard after big parties at the temple and also cars parking on our property during events at the temple. We prefer not to have to deal with this sort of behavior at the George Washington Boulevard site. That was the evidence presented to the Board of Supervisors. Kennedy. But can't that be taken care of by conditions? It can be taken care of by conditions, but there's no saying that it wasn't taken care of by conditions at the Bogue Road site and that it was ultimately an enforcement problem. In either event, it lends support to the concern that leapfrogged development causes inconsistencies with neighboring land uses, and that was the basis for the determination. One final statement, and then I promise I'll stop. The comment was made that Smith makes reference to individualized assessments. I urge you to read the whole statement. Individualized assessments of the reasons for the relevant conduct. That's what Smith is concerned about. And here, the reasons for the relevant conduct have nothing to do with religion or secular concerns at all, has only to do with land use issues. Thank you, Your Honors. Any questions? Thank you, counsel. Thank you to both counsel for very good arguments on this difficult case. The case just argued is submitted for decision by the court. And the final case on calendar for argument is Elsinore Christian Center v. City of Lake Elsinore. Thank you.
judges: D.W. Nelson, Rawlinson, Bea